UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCOTT DALECKE,

|                                    |                                            |
|------------------------------------|--------------------------------------------|
| Plaintiff,                         | Civil Action No. 18-11970                  |
|                                    | Honorable Sean F. Cox                      |
| v.                                 | Magistrate Judge David R. Grand            |

NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,

Defendant.
_____/

**REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY
JUDGMENT [12, 16]**

Plaintiff Scott Dalecke ("Dalecke") brings this action pursuant to 42 U.S.C. § 405(g),

challenging the final decision of Defendant Commissioner of Social Security ("Commissioner")

denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act

(the "Act"). Both parties have filed summary judgment motions (Docs. #12,  #16), which have

been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §

636(b)(1)(B).

**I. RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge's

("ALJ") conclusion that Dalecke is not disabled under the Act is not supported by substantial

evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary

Judgment (Doc. #16) be **DENIED,** that Dalecke's Motion for Summary Judgment (Doc. #12) be

**GRANTED IN PART** to the extent it seeks remand, and **DENIED IN PART** to the extent it seeks an award of benefits and that, pursuant to 42 U.S.C. § 405(g), this case be **REMANDED** to the ALJ for further proceedings consistent with this Recommendation**.**

## II. REPORT

### A. Background

Dalecke was 48 years old at the time of his alleged onset date of April 10, 2014, and at 5'8" tall weighed approximately 300 pounds during the relevant time period.[1] (Tr. 338). He had obtained his GED and, prior to filing his instant application for DIB, had most recently worked as a production line worker and a machine operator at U.S. Manufacturing building axles for Jeep Wranglers (Tr. 340, 359).  He alleges disability primarily as a result of back pain. (Tr. 465).

After Dalecke's application for DIB was denied at the initial level on August 28, 2015 (Tr. 379), he timely requested an administrative hearing, which was held on January 31, 2017, before ALJ Roy E. LaRoche, Jr. (Tr. 329-365). Dalecke, who was represented by attorney Nicole M. Winston, testified at the hearing, as did vocational expert Stephanee A. Leech. (*Id.*). On March 29, 2017, the ALJ issued a written decision finding that Dalecke is not disabled under the Act. (Tr. 312-324). On April 23, 2018, the Appeals Council denied review. (Tr. 1-9). Dalecke timely filed for judicial review of the final decision on June 21, 2018. (Doc. #1).

---

[1] Dalecke alleges an onset date of April 10, 2014, and seeks benefits through the date of the ALJ's decision on March 29, 2017.  The Agency subsequently determined Dalecke to be disabled as of March 30, 2017, in an award letter dated October 5, 2018.  (Doc. #12 at n.1).  Relatedly, the Court notes that, in this case, the Appeals Council acknowledged that Dalecke submitted additional medical records from Associated Retinal Consultants, P.C., dated September 18, 2017-November 17, 2017 (48 pages) and dated November 17, 2017-January 12, 2018 (48 pages). The Appeals Council advised that, if Dalecke wanted such evidence considered, he would have to file a new application because these medical records did not relate to the period at issue and did not affect the ALJ's decision about whether he was disabled on or before March 29, 2017. (Tr. 2).

The Court has thoroughly reviewed the transcript in this matter, including Dalecke's medical record, Function and Disability Reports, and testimony as to his conditions and resulting limitations. Instead of summarizing that information here, the Court will make references and provide citations to the transcript as necessary in its discussion of the parties' arguments.

## B. The ALJ's Application of the Disability Framework Analysis

Under the Act, DIB are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits ... physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps.... If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Dalecke is not disabled under the Act. At Step One, the ALJ found that Dalecke has not engaged in substantial gainful activity since April 10, 2014, the alleged onset date. (Tr. 314). At Step Two, the ALJ found that he has the severe impairments of obesity, degenerative disc disease status post two surgical procedures; left sciatic neuropathy status post surgery; loss of visual acuity; and diabetes mellitus (20CFR 404.1520(c)). (*Id.*). At Step Three, the ALJ found that Dalecke's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (Tr. 315).

The ALJ then assessed Dalecke's residual functional capacity ("RFC"), finding that he is capable of performing light work, with the following additional limitations: occasional operation of foot controls with the bilateral lower extremities; alternatively sitting/standing at will, provided he is not off task more than 10% of the workday; no climbing of ladders, ropes and scaffolds; occasional climbing of ramps/stairs; occasional balancing, stooping, kneeling, crouching, or crawling; no more than occasional exposure to extreme cold, humidity/wetness, and vibration; no exposure to unprotected heights or moving mechanical machinery; and no commercial driving or operation of heavy equipment.  (Tr. 315).  At Step Four, the ALJ concluded, based in part on testimony provided by the vocational expert ("VE") in response to hypothetical questions, that Dalecke is not capable of performing his past relevant work as a production line worker or machine operator (Tr. 323). At Step Five, the ALJ concluded that, considering his age, education, work

4

experience and RFC, there are jobs that exist in significant numbers in the national economy that Dalecke can perform at the light level, including bench assembler (40,000 jobs), packer (200,000 jobs) and inspector (80,000 jobs). (Tr. 324).  As a result, the ALJ concluded that Dalecke is not disabled under the Act. (*Id.*).

**C. Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *See Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496,

508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

**D. Analysis**

In his motion for summary judgment, Dalecke argues that the ALJ erred: (1) by failing to obtain a medical opinion on the issue of equivalency as required by SSR 96-6p; (2) by violating the treating physician rule by improperly weighing and evaluating the opinion evidence of his treating physicians, Drs. Pasia and Bruer; and (3) in his RFC determination. Each issue is addressed below.

*1. Remand is not Required Under SSR 96-6p*

Dalecke's initial argument is that the ALJ erred at Step Three of the sequential analysis when he failed to obtain an expert medical opinion as to whether his impairments medically equal Listings 1.04(A), 2.04, or 11.14 or the criteria of 9.00(B)(5).[2] At Step Three, the plaintiff bears the burden of establishing that his impairments meet or medically equal a listed impairment.[3] *See Bingaman v. Comm'r of Soc. Sec.*, 186 F. App'x 642, 644 (6th Cir. 2006). "When a claimant has a listed impairment but does not meet the criteria, an ALJ can find that the impairment is 'medically

---

[2] Dalecke's emphasis here and the focus of his summary judgment motion overall appears to be on Listing 1.04.

[3] Dalecke does not challenge the ALJ's finding that he does not *meet* the requirements of any Listing and, thus, any such argument is waived. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (undeveloped claims are waived).

equivalent' to the listing if the claimant has 'other findings related to [the] impairment that are at least of equal medical significance to the required criteria.' " *Thomas v. Comm'r of Soc.*, No. 12-14758, 2014 WL 688197, at *8 (E.D. Mich. Feb. 21, 2014) (quoting 20 C.F.R. § 416.926(a)).

Here, the ALJ found that Dalecke "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1[.]" (Tr. 315). Specifically, the ALJ stated:

> The obesity does not meet or medically equal any listing, singly or in combination with the other impairments because there is no evidence in the case record of the requisite impact on musculoskeletal, respiratory, cardiovascular, or other body system functioning.
>
> The degenerative disc disease does not meet or medically equal listing 1.04 because the claimant lacks the requisite motor and sensory deficits and there is no evidence of spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication.
>
> The left sciatic neuropathy does not meet or medically equal listing 11.14 because the claimant lacks the requisite disorganization of motor function resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, or marked limitation in physical functioning and in one of the following areas of mental functioning: understanding, remembering, or applying information; interacting with others: concentrating, persisting, or maintaining pace; or adapting or managing oneself.
>
> The vision disorder does not meet or medically equal listing 2.04 because the claimant lacks the requisite loss of visual acuity, contraction of peripheral visual fields, or loss of visual efficiency in the better eye.
>
> The diabetes mellitus does not meet or medically equal any impairment in the revised listings for endocrine disorders, specifically 9.00(B)(5), because there is no evidence of the requisite complications of acute or long-tern hyperglycemia, hypoglycemia unawareness, or complications of hypoglycemia. There also is no evidence in the case record of the requisite impact on other body system functioning.

(Tr. 315).

It is undisputed that in reaching his Step Three conclusions, the ALJ did not obtain an expert medical opinion as to whether his impairments medically equal any of the above Listings. [4] For the reasons set forth below, the ALJ did not err in failing to obtain such an opinion, and his decision is supported by substantial evidence.

Dalecke relies on Social Security Ruling ("SSR") 96-6p, and its applicable case law in arguing that because the Single Decision-maker Model (SDM)[5] was used at the initial level and the ALJ did not solicit expert medical evidence, remand is necessary. As the Commissioner points out, however, SSR 96-6p was superseded by SSR 17-2p[6] which became effective on March 27, 2017, making it applicable to the ALJ's decision in this case, which was issued on March 29, 2017. *SSR 17-2p*, 2017 WL 3928306. Because the ALJ found that Dalecke's impairments are not medically equivalent to the Listings' requirements, the following portion of SSR 17-2p describes the evidentiary requirements applicable to such a finding:

> If an adjudicator at the hearings or AC level believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, *we do not require the adjudicator to*

---

[4] Dalecke correctly points out that, in this case, there is no opinion from a medical consultant or medical expert as to equivalence; rather, the record contains only the assessment of a single decision maker (Tr. 366-378), which is not medical evidence.

[5] "The 'single decisionmaker model' was an experimental modification of the disability determination process that happens to have been used in Michigan. This experiment eliminated the reconsideration level of review and allowed claims to go straight from initial denial to ALJ hearing. Most significantly, it allowed the state agency employee (the single decisionmaker) to render the initial denial of benefits without documenting medical opinions from the state agency medical consultants. 20 C.F.R. §§ 404.906(b)(2), 416.1406(b)(2)." *Leverette v. Comm'r of Soc. Sec.*, No. 10-10795, 2011 WL 4062380, at *2 (E.D. Mich. Aug. 17, 2011*), report and recommendation adopted,* No. 10-10795, 2011 WL 4062047 (E.D Mich. Sept. 13, 2011).

[6] SSRs are binding on all components of the agency. *See* 20 C.F.R. § 402.35(b)(1). As the agency's interpretation of its own regulations, an SSR "is entitled to substantial deference and will be upheld unless plainly erroneous or inconsistent with the regulation." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 549 (6th Cir. 2004).

> obtain [medical expert] evidence or medical support staff input prior to making a step 3 finding that the individual's impairment(s) does not medically equal a listed impairment.

*SSR 17-2p*, 2017 WL 3928306, at *4 (emphasis added). Moreover, with respect to an ALJ's responsibility to articulate the grounds for a "not medically equivalent" finding, SSR 17-2p provides:

> [A]n adjudicator at the hearings or AC level must consider all evidence in making a finding that an individual's impairment(s) does not medically equal a listing. *If an adjudicator at the hearings or AC level believes that the evidence already received in the record does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, the adjudicator is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment. Generally, a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding.* An adjudicator's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3.

*Id.* (emphasis added).

In this case, the ALJ specifically found that Dalecke "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[,]" including Listings 1.04, 2.04, or 11.14 or the criteria of 9.00(B)(5). (Tr. 315). Thus, under SSR 17-2p, because the ALJ found that the evidence did not reasonably support a finding that Dalecke's impairments medically equaled these Listings, he was *not* required to first obtain medical expert evidence to support that finding, nor was he required to specifically articulate the bases for that conclusion. *See, e.g., Marvin v. Comm'r of Soc. Sec.*, No. 17-330, 2018 WL 4214339, at *3, n. 3 (W.D. Mich. Aug. 10, 2018) (SSR 17-2p "has clarified that an ALJ is not required to obtain a medical expert's opinion before making a finding that an individual's impairments do not meet or equal a listing impairment"); *DeGonzalez v. Berryhill*, No. 16-CV-

06723, 2018 WL 6834474, at *8, n. 4 (E.D. N.Y. Dec. 28, 2018) ("SSR 17-2p also makes clear that an ALJ does not need to obtain a medical expert opinion to determine that impairments are *not* medically equivalent to a listing, whether or not the initial determination was made by a[ ] [single decision maker].") (emphasis in original); *Holmes v. Comm'r of Soc. Sec.*, No. 1:17-cv-1648, 2018 WL 3544902, at *3 (N.D. Ohio July 24, 2018). Accordingly, Dalecke is not entitled to remand on this ground.

### 2. The Treating Physician Rule[7]

Dalecke argues that the ALJ failed to comply with 20 C.F.R. § 404.1527(d)(2) and applicable case law in "essentially rejecting" the opinions of his treating physicians, Drs. Pasia and Bruer.

#### a. Dr. Pasia's Opinion

Dr. Pasia began treating Dalecke for lower back pain in May 2014 and continued seeing him at least through July 2015 (Tr. 757, 742). On July 16, 2014, Dr. Pasia performed a lumbar laminectomy and discectomy on Dalecke. (Tr. 526, 543-544). Dr. Pasia completed a Lumbar Spine Residual Functional Capacity Questionnaire on January 21, 2015, during the time period he still was treating Dalecke. (Tr. 757-760). He indicated a diagnosis of herniated disc L4/5 and L5-S1, low back pain and lower extremity radiculopathy based on the MRI completed on January 8, 2015. (*Id*. at 757). He noted a limited range of motion at the lumbar spine and antalgic gait,

---

[7] "The treating physician rule has been abrogated as to claims filed on or after March 27, 2017. *See* 20 C.F.R. § 404.1520c ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) ... including those from your medical sources."); s*ee also Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5852-57 (Jan. 18, 2017). The new regulations eliminate the term "treating source," as well as what is customarily known as the treating source or treating physician rule." *Word v. Commissioner of Social Security,* No. 1:18-CV-00187-SKL, 2019 WL 2396556, at *9 (E.D. Tenn. June 6, 2019). Because Dalecke's application was filed before March 27, 2017, the treating physician rule applies. *See* 20 C.F.R. § 404.1527.

abnormal gait, and muscle spasm. (*Id*. at 757-758).  Further, he indicated that Dalecke's symptoms were severe enough to frequently interfere with his concentration. (*Id*. at 758). Dr. Pasia also opined that Dalecke could walk less than one city block, sit for 15 minutes before needing to get up, stand for 15 minutes at a time, and sit or stand for about 2 hours in an 8-hour working day. (*Id*. at 759).  Additionally, Dr. Pasia stated that, in an 8-hour workday, Dalecke would need to walk for five minutes every 15 to 20 minutes, required the ability to shift positions, and would sometimes need to take unscheduled breaks of 10-30 minutes 10-12 time per day but did not need to elevate his leg with prolonged sitting. (*Id*.).  Dr. Pasia indicated that Dalecke could lift less than ten pounds occasionally and ten pounds rarely.  (*Id.*).  Finally, he stated that Dalecke could never twist, stoop, bend, or climb ladders, could climb stairs, had no limitations with reaching, handling, or fingering, and was likely to be absent from work more than four days per month.  (*Id*. at 760).

### b.  Dr. Bruer's Opinion

Dr. Bruer was Dalecke's primary care physician and was treating him for diabetes which had been diagnosed in July 2015, among other conditions. (Tr. 349, 783).  Dr. Bruer completed a "Physical Residual Functional Capacity Questionnaire" form on December 13, 2016.  (Tr. 814-818).  He stated that Dalecke had "pain bilateral lower extremities" and "chronic back pain."  (*Id*. at 814). In response to a question regarding "the treatment and response including any side effects of medication which may have implications for working," he stated "[p]atient unable to work due to chronic pain and neuropathy." (*Id*. at 815).  Dr. Bruer indicated that Dalecke's pain would frequently interfere with his attention and concentration, that Dalecke was "[i]ncapable of even 'low stress' jobs," and that the reason for this conclusion was "chronic pain."  (*Id*. at 815-816). He opined that Dalecke could walk less than 200 feet without rest or severe pain. (*Id.* at 816).  Further, Dr. Bruer indicated that in a typical eight-hour workday, Dalecke could sit for less than a

total of hours, stand/walk for a total of less than two hours and required a sit/stand at will option.

(Tr. 816-817). It was his opinion that Dalecke could carry less than ten pounds only rarely, on an

hourly basis required unscheduled breaks of ten to fifteen minutes, and when sitting needed to

elevate his legs to waist level at least 50% of the time.   (*Id*. at 817).   Additionally, Dalecke could

never twist, stoop (bend), crouch, or climb ladders or stairs. (*Id*. at 818).  Finally, Dr. Bruer opined

that Dalecke would be absent from work more than four days per month.   (*Id*.).

### b.   The ALJ's Analysis

The ALJ specifically addressed the opinions of Drs. Pasia and Bruer as follows:

> In considering the opinions [of] treating physicians, Drs. Pasia and Bruer
> (Exs. 11F; 14F), the undersigned notes that each used a checklist-type form,
> which is weak evidence at best (*Mason v. Shalala*, 994 F.2d 1058, 1065 (3d
> Cir. 1993).  Further, a treating physician's checkmarks on an MSS form
> may be discounted where, as here, they are contradicted by other objective
> medical evidence in the record (SSR 96-2).  The opinions offered by Drs.
> Pasia and Bruer are not consistent with the evidence as a whole, particularly
> the clinical findings documented by treating neurologist Dr. Gilmer in
> October 2016 (Ex. 18F, p. 20).   Further, Dr. Pasia's opinion is
> unsubstantiated by his treatment notes and thus it lacks relevant supporting
> evidence.  Given these factors, the undersigned ascribes little weight to the
> foregoing opinions.

(Tr. 322).

"Generally, the opinions of treating physicians are given substantial, if not controlling,

deference," but they "are only given such deference when supported by objective medical

evidence." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (citing *King v.

Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) and 20 C.F.R. § 404.1527(d)(2)). Thus, an ALJ "'must'

give a treating source opinion controlling weight if the treating source opinion is 'well-supported

by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with

the other substantial evidence in [the] case record.'" *Blakley*, 581 F.3d at 406 (internal quotations

omitted); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7 (July 2, 1996).  However,

it is "error to give [a treating source] opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole. SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996).  Accordingly, "the Sixth Circuit has held that '[a]n [ALJ] may give more weight to the opinions of examining or consultative sources where the treating physician's opinion is not well-supported by the objective medical records.'" *Kilkolski v. Comm'r of Soc. Sec.*, No. 14-cv-14700, 2016 WL 6080217, at *9 (quoting *Dyer v. Soc. Sec. Admin.*, 568 F. App'x 422, 428 (6th Cir. 2014) ), *report and recommendation adopted*, 2016 WL 1357900, at *6 (E.D. Mich. Apr. 5, 2016).

If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, considering a number of factors, including the "length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(2) (establishing that the ALJ must "give good reasons" for the weight given to a treating source opinion)). "Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include 'good reasons ... for the weight ... give[n] [to the] treating source's opinion' – not an exhaustive factor-by-factor analysis." *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). Ultimately, "[t]his procedural 'good reason' rule serves both to ensure adequacy of review and to permit the claimant to understand the disposition of his case." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550-51 (6th Cir. 2010) (citing *Rogers*, 486 F.3d at 242). That a treating physician's opinion is inconsistent with the record constitutes a "good

reason" for not giving controlling weight to it. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 417-18 (6th Cir. 2011).

As indicated, the primary reason the ALJ gave for discounting these opinions is that they were supposedly not consistent with the evidence as a whole and specifically with the clinical findings documented by treating neurologist Dr. Gilmer, in *October 2016*. The ALJ also stated that Dr. Pasia's opinion was not supported by his treatment notes. (Tr. 322). These medical opinions cover distinctly different time periods in Dalecke's course of treatment. Accordingly, the Court will consider the ALJ's analysis as to each opinion separately.

Dr. Bruer's opinion was issued approximately two months after Dr. Gilmer's clinical findings. Dalecke's medical records reveal six office visits to Dr. Bruer between June 15, 2016, and November 22, 2016. (Tr. 762-786). At his appointment on June 15, 2016, Dalecke reported some recent aggravation of his back pain but noted that his neurologist had advised treatment with an increased dose of gabapentin. (*Id*. at 784). Dalecke also reported taking Flexeril but did not believe that it was helping and wanted to switch to something else. (*Id*. at 784). During this time period, Dr. Bruer primarily treated Dalecke for diabetes. (*Id*. at 762-786).

Other providers, however, were treating Dalecke for his back pain issues either immediately prior to or during this same time period. For example, Dalecke began treating with Dr. Daniel Fahim of the Michigan Head & Spine Institute in October, 2015. (Tr 898-901). At that time, Dr. Fahim reviewed an MRI of Dalecke's lumbar spine which he described as showing "significant soft tissue destruction of a previous open lumbar spine laminectomy" with " trace evidence of a small unilateral laminectomy at the L4-L5 level, without any evidence of laminectomy at the L5-Sl level" and "persistent foraminal stenosis at L5-S1 and at L4-L5 on the left side." (*Id*.). As a result, he recommended a "left-sided L4-L5 laminectomy, medial

facetectomy, and foraminotomy for decompression of exiting nerve roots." This surgery was performed on November 16, 2015. (Tr. 922-923). Dr. Fahim offered a post-ostoperative diagnosis of lumbar disc disease/herniation. (Tr. 922-927).

Dr. Fahim's report dated December 1, 2015, indicates that Dalecke reported improvement in the preoperative lower extremity symptoms and essentially no back pain. (Tr. 895-897). Dalecke saw Dr. Fahim again on February 23, 2016. (Tr. 892-894). At that time, Dalecke reported left lower extremity numbness and weakness which Dr. Fahim believed was caused by left peroneal nerve entrapment most likely at the fibular head. (*Id.*). Dr. Fahim did not believe Dalecke's symptoms were consistent with an active lumber radiculopathy but nevertheless recommended an MRI of the lumbar spine. (*Id.*). This MRI was performed on March 4, 2016. (Tr. 793-794, 904-905). The Impression was listed as: "Postsurgical changes L4-L5 and L5-S1 is stable borderline canal stenosis and bilateral foraminal encroachment, disc bulging spinal stenosis is less apparent on exam at the L2-L3 level. MRI on 3/4/2016." (Tr. 793-794). In treatment records from May 19, 2016, Dr. Fahim stated that the MRI of the lumbar spine reveals "no areas of any central canal stenosis, foraminal stenosis, disc herniation, nerve root compression, or any other concerning abnormalities." (Tr. 885-887).

Based on his belief of a possible nerve entrapment, Dr. Fahim referred Dalecke to Dr. Holly Gilmer. (Tr. 893). She first saw Dalecke on May 5, 2016. (Tr. 888-891). At that time, he complained of left lower extremity pain and she recommended exploration with neurolysis of the sciatic nerve, peroneal and tibial nerve. (*Id.*). This surgery was completed July 18, 2016. (Tr. 902-903; 918-921). Dr. Gilmer saw Dalecke again on August 4, 2016. (Tr. 881-884). At this appointment, she noted that he had had resolution of the left lateral lower extremity pain and that his lower left extremity strength was 5/5 in the following: iliopsoas, quadriceps, and hamstrings;

anterior tibialis; eversion; toe extension, toe flexion, inversion, and plantarflexion. (*Id.*). Further, his coordination was intact, his gait revealed normal stance, and heel toe and tandem walking were performed without difficulty. (*Id.*). She saw Dalecke again on October 27, 2016. (Tr. 878-880). Her report states that, at that time, Dalecke's sensation was intact in the upper and lower extremities, his strength in the lower extremities was 5/5 bilaterally in all muscle groups, his coordination was intact, his gait indicated normal stance, heel, toe and tandem walking were performed without difficulty, and overall, from a neurological standpoint Dalecke was doing very well. (*Id.*).

Dr. Bruer completed his RFC questionnaire on December 13, 2016. This was not quite two months after Dr. Gilmer had seen Dalecke and had found him to be "doing very well." Additional medical records indicate that on January 23, 2017, Dr. Bruer ordered an MRI of Dalecke's lumbar spine. (*Id.* at 860). The MRI report states:

> The lumbar vertebrae have normal alignment. There is mild decreased signal in the disks at L4-5 and L5-S1 without significant space narrowing. There are small posterior disc herniations at L4-5 and L5-S1. There is a developmentally small spinal canal at L4-5. There is L5 laminectomy on the left side. There is no paraspinal mass. There is no compression fracture. There is some epidural enhancement around the spinal canal at the L5-S1 level consistent with epidural scarring. The sacroiliac joints appear normal. The neural foramina are fairly well maintained. There is no compression fracture. I see no focal bone destruction.
>
> IMPRESSION: Small posterior disc herniations at L4-5 L5-S1 without change compared to 3/4/2016. Mild epidural scarring at L5-S1. There is a mild relative spinal stenosis at L4-5. No significant change compared to old exam. There is a very small posterior disc herniation at L2-3 without significant impingement on the spinal canal.

(Tr. 860).

Dr. Bruer's assessment predates Dalecke's MRI by slightly more than one month. Significantly, these MRI results are noted to be consistent with Dalecke's MRI results in March

16

2016.  Additionally, between those two dates Dalecke had undergone treatment with Dr. Gilmer for nerve entrapment and her findings suggested marked improvement in the interim.  Despite this, as the ALJ noted, Dr. Bruer proceeded to assess "more stringent limitations than those set forth in Dr. Pasia's Medical Source Statement."  (Tr. 320).  Based on all of the above, the ALJ's conclusion that Dr. Bruer's December 13, 2016 opinion was "not consistent with the evidence as a whole, particularly the clinical findings documented by treating neurologist Dr. Gilmer in October 2016" is supported by substantial evidence and constitutes a "good reason" for giving that opinion "little" weight.

The same cannot be said with respect to the ALJ's analysis of Dr. Pasia's opinion which was issued approximately *21 months before* Dr. Gilmer's clinical findings.  The ALJ's chronological recitation of Dalecke's medical evidence spans nearly four pages of his opinion. (Tr. 317-320).  First, the ALJ provided a detailed discussion of the medical records from the time period between Dalecke's initial MRI results dated April 22, 2014 and July 16, 2014, when Dalecke underwent back surgery.  The ALJ noted that an April 22, 2014 MRI study revealed degenerative disc disease at L1-L2 and disc herniations at levels L4-5 and L5-S1, and that a May 28, 2014 EMG/nerve conduction study that demonstrated lumbar radiculopathy.  (Tr. 317).  The ALJ noted that Dalecke underwent numerous physical therapy sessions and at least two epidural steroid injections in an attempt to conservatively treat his back.  (*Id.*).  This conservative treatment was apparently unsuccessful, though, as the ALJ noted that on July 16, 2014, Dalecke underwent a lumber laminectomy and discectomy.  (*Id.*).  In short, Dalecke's documented back condition was serious enough throughout the first half of 2014 to warrant surgery.

The ALJ then noted that Dalecke again attempted conservative treatment – 11 more physical therapy sessions – following his surgery.  (*Id.*).  The ALJ then noted that Dalecke

presented to Dr. Pasia on September 30, 2014 with "increased low back pain and left lower extremity radiculopathy symptoms." (*Id.*). The ALJ noted that although Dalecke's surgical incision had healed, he still had some pain with palpation of the left lateral lumbar area and with left plantar flexion, and that he had a limited lumbar range of motion. (*Id.*). The ALJ noted that a few months later, on January 6, 2015, Dalecke underwent an x-ray which showed "retrolisthesis (approximately 4 mm) at level L5-S1" and "some decreased disc space at level L4-L5." (*Id.*). The ALJ also noted that he underwent an MRI study around the same time which showed "mild spinal canal stenosis at level L4-L5 … multifactorial mild spinal canal stenosis at level L2-L3; and multifactorial mild to moderate bilateral foraminal stenosis at L5-S1 and mild bilateral foraminal stenosis at level L4-L5 without substantial interval change since April 22, 2014. (*Id.*).

The ALJ noted that, on January 13, 2015 – about one week before Dr. Pasia completed the RFC questionnaire – Dalecke reported to Dr. Pasia "that his symptoms were unimproved relative to pain radiating from the left buttock down the thigh, calf, and foot of his left leg, and numbness and tingling at his left foot … symptomatology of increased spasm at the at the lumbar spine, and bilateral lower extremity weakness," and that "physical examination revealed slight limp … [and] some paravertebral spasm." (Tr. 317-18). In short, even during the period between Dalecke's back surgery and Dr. Pasia's opinion, objective medical evidence exists in the record supporting Dalecke's ongoing back impairment.

The ALJ then discussed Dr. Pasia's treatment notes from appointments after the Dr. issued his RFC opinion. These records, too, reflect that Dalecke was continuing to experience back problems. For instance, the ALJ noted that on February 24, 2015, "Dr. Pasia observed that the claimant moved '…very gingerly, protecting his back" and that "the claimant exhibited difficulty toe-and heel-walking at the left lower extremity." (*Id.*). Finally, the ALJ noted that Dalecke saw

Dr. Pasia about two months later, reporting that "he had not experienced significant improvement in low back pain and left lower extremity radiculopathy symptoms," and that "physical examination findings were unchanged" from the February 24, 2015 appointment. (*Id.*).

In short, the ALJ cited a litany of evidence for the period from April 22, 2014 until February 24, 2015, which is at least arguably consistent with Dr. Pasia's January 2015 opinion. Yet, the ALJ did not address the consistency or inconsistency of Dr. Pasia's opinion with any of this medical evidence. To the extent this evidence is consistent with Dr. Pasia's opinion, the ALJ erred in giving the opinion little weight simply because he found it was inconsistent with Dr. Gilmer's clinical findings, reached approximately 21 months after Dr. Pasia issued his opinion. At a minimum, the ALJ, conducting a proper evaluation, could find that Dr. Pasia's opinion was entitled to significantly greater deference for a limited period of time exceeding one year. The law is clear, however, that only the ALJ – and not this Court – can reconcile the aforementioned medical evidence against Dr. Pasia's opinion. *See Pruitt v. Comm'r of Soc. Sec.*, 2015 WL 5730023, at *6 (E.D. Mich. Aug. 24, 2015) ("Indeed, it is the role of the ALJ, not the court, to weigh the evidence and resolve any conflicts therein.").

The ALJ also discounted Dr. Pasia's opinion because he supposedly used a "checklist-type form." This also was not a "good" reason for giving the opinion little weight. Although Dr. Pasia provided certain information by merely checking boxes on the form – which can, *without more*, be a valid reason for discounting the opinions[8] – here, the ALJ failed to note that on that very same form, Dr. Pasia provided diagnoses supporting his opinions, including herniated disc and lower

---

[8] *See Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 566-67 (6th Cir. 2016) ("Many courts have cast doubt on the usefulness of these forms and agree that administrative law judges may properly give little weight to a treating physician's check-off form of functional limitations that did not cite clinical test results, observations, or other objective findings ….") (internal quotations omitted) (citing cases).

extremity radiculopathy, with a "guarded" prognosis. (Tr. 757-60). The ALJ also failed to note

that on the supposed "check-list" form, Dr. Pasia identified numerous specific objective findings

supporting his opinion, including many noted by the ALJ in his chronological discussion of

Dalecke's back impairment, such as foraminal stenosis, retrolisthesis, facet arthrosis, degenerative

disc disease, limited range of motion of the lumbar spine and antalgic gait, and muscle spasm. (Tr.

757). Dr. Pasia also confirmed that Dalecke was not a malingerer. (*Id.*). Thus, Dr. Pasia's opinion

was not the type of "checkbox" opinion suggested by the ALJ, and the ALJ erred in offering this

as a reason for discounting Dr. Pasia's opinions.

For all of these reasons, the ALJ's decision to give little weight to Dr. Pasia's opinion is

not supported by substantial evidence. Accordingly, remand is required for a proper evaluation

under the treating physician rule. On remand, the ALJ should consider whether Dalecke was

disabled between the alleged onset date of April 10, 2014 and the date of Dr. Gilmer's clinical

findings made in October 2016, or for some lesser period of time exceeding one year.[9]

---

[9] In light of this recommendation, the Court need not consider Dalecke's argument that the RFC adopted by the ALJ is not supported by substantial evidence. The Court notes, however, that in *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018), the Sixth Circuit held, "[w]e have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ." (citing *Shepard v. Comm'r of Soc. Sec.*, 705 Fed.Appx. 435, 442–43 (6th Cir. 2017) ("An RFC is an 'administrative finding,' and the final responsibility for determining an individual's RFC is reserved to the Commissioner.")). Thus, an ALJ is not only qualified, but obligated, to review all record evidence to determine the RFC. *See* 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c), 416.946(c) ("... the administrative law judge ... is responsible for assessing your residual functional capacity."); *Mokbel-Aljahmi*, 732 F. App'x at 399 ("In formulating a residual functional capacity, the ALJ evaluates all relevant medical and other evidence and considers what weight to assign to treating, consultative, and examining physicians' opinions.") (quoting *Eslinger v. Comm'r of Soc. Sec.*, 476 Fed.Appx. 618, 621 (6th Cir. 2012)).

## III. CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment (**Doc. #16**) be **DENIED**, Dalecke's Motion for Summary Judgment (**Doc. #12**) be **GRANTED IN PART** to the extent it seeks remand, and **DENIED IN PART** to the extent it seeks an award of benefits and that, pursuant to 42 U.S.C. § 405(g), this case be **REMANDED** to the ALJ for further proceedings consistent with this Recommendation.


Dated: June 24, 2019               s/David R. Grand
Ann Arbor, Michigan           DAVID R. GRAND
                               United States Magistrate Judge


## NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 24, 2019.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager

22